IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JUNIOR L. LOUDERMILK,

           Plaintiff,

           v.                                          Civil Action No. 1:07-CV-141

MICHAEL J. ASTRUE,
Commissioner of Social Security,

           Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.     Background

           Plaintiff, Junior Loudermilk, (Claimant), filed a Complaint on October 17, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 133(c) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

September 30, 2008.[2]  Claimant filed his Motion to Reverse or Remand on November 5, 2008.[3]

Commissioner filed his Motion for Summary Judgment on December 4, 2008.[4]  Claimant filed

his Reply to Defendant's Brief in Support of Judgment on the Pleadings on December 12, 2008.[5]

---

[1] Docket No. 1.

[2] Docket No. 12.

[3] Docket No. 14.

[4] Docket No. 16.

[5] Docket No. 20.

B.      The Pleadings

     1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

     2.      Defendant's Brief in Support of Motion for Summary Judgment.

     3.      Plaintiff's Reply to Defendant's Brief in Support of Judgment on the Pleadings.

C.      Recommendation

I recommend that:

     1.      Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because substantial evidence supports the ALJ's conclusion that work exists in significant numbers in the national economy that Claimant can perform.  The ALJ's failure to question the VE on this matter was not error because the ALJ appropriately relied upon Medical-Vocational Guideline (GRID) Rule 203.14 to reach his conclusion that Claimant is not disabled and could perform a full range of unskilled medium work.

     2.      Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

## II.  Facts

A.      Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on January 20, 2005 alleging disability since May 15, 2001 (Tr. 71, 239), due to breathing problems, black lung disease, high blood pressure, acid reflux and hearing problems.  (Tr. 96).  The claim was denied initially on May 4, 2005 (Tr. 35).  Thereafter, on May 30, 2005, Claimant filed a Request for Reconsideration.  (Tr. 40).  The claim was denied upon reconsideration on July 22, 2005.  (Tr. 41).  Claimant filed a written request for a hearing on

September 14, 2005. (Tr. 45). Claimant's request was granted and a hearing was held on July 17, 2006 (Tr. 47, 257).

The ALJ issued an unfavorable decision on September 22, 2006 (Tr. 15-25). The ALJ determined Claimant was not disabled under the Act because he retained the residual functional capacity to perform unskilled medium work and was not disabled pursuant to Medical-Vocational Guideline (GRID) Rule 203.14. (Tr. 18-25). On November 21, 2006, Claimant filed a request for review of that determination. (Tr. 12-13). The request for review was denied by the Appeals Council on September 28, 2007 (Tr. 6-8). Therefore, on September 28, 2007, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on October 29, 1947 and was fifty-three (53) years old as of the onset date of his alleged disability and fifty-eight (58) as of the date of the date of the ALJ's decision. (Tr. 71, 261). Claimant was therefore considered a "person of advanced age," age 55 or older, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(e), 416.963(e) (2008). Claimant graduated from high school and has past relevant work in a lumber yard as a lumber stacker. (Tr. 97, 100, 261).

C.    Medical History

The following medical history is relevant to the sole issue of whether the ALJ erred by failing to question the VE on existing jobs in the national economy that Claimant could perform:

**Miraflor Khorshad, M.D., Medical Report and Consultative Examination March 16, 2005, (Tr. 137-154)**

Ventilatory Function Report - March 16, 2005:
No evidence of Bronchospasm; no Acute Respiratory Illness present.
Spirometric results appear normal; patient currently on respiratory medications
Radiology Report:
Clinical Data - High blood pressure
Chest, PA and Lateral - No previous films for comparison.  Lungs are clear.  Heart is normal.
No pneumohydrothorax/
Impression - Essentially normal chest

Report summary as written to JoEllen Grass of WV DDS:
Present Complaints and Functional Limitations:
1.  Persistent shortness of breath
2.  Unable to do household chores due to shortness of breath
3.  Unable to sit, stand or walk for a prolonged period of time
4.  Able to lift 10-15 lbs. of weight
5.  Able to drive 10-15 miles
6.  Has decreased hearing in his right ear

Current Medication:
Hyzaar, 50/12.5 qd, Aciphex 20 mgs. qd, Meclizine HCL 25 mgs. qd., Albuterol inhaler 2 puffs
qid.  Foradil Aerolizer 1 cap, bid.

Review of Systems:
Chronic fatigue.  Difficulty swallowing.  No nosebleed.  No sinus problem.  No sorethroat.
Ringing in right ear.  Decreased motion to the neck.  No thyroid problem.  Admits chest pain and
shortness of breath.  Has coughing.  No wheezing.  No chronic abdominal pain.  No nausea,
vomiting or diarrhea..  Has weakness and dizziness.  No seizures, fainting spells or tics.  Has
heat intolerance.

Physical Examination:
No respiratory distress.  Normal gait.  Upper and lower extremity muscle strength is 4/5
bilaterally.

Lungs - Bilateral basal dry rales.
Cardiovascular - Normal sinus rhythm.  No murmur.  No thrill.
Neurological - Alert and oriented.  Cranial nerves II-XII are intact.  All sensory modalities are
well preserved.
Audiological Screening - Conduction deafness at 1000, 2000 and 4000 Hz Frequencies, 25
Decibel HL in the right ear and form 500 to 4000 Hz frequencies in the left ear.
Spirometric results appear normal.
Radiological Findings - Chest x-ray showed lungs are clear.  The heart is normal.  No
pneumohydrothorax.

Diagnosis:

1. Essential Hypertension, stable
2. Coronary Artery Disease
3. Conduction Deafness, both ears
4. Impacted cerumen, left ear

It was noted the Claimant's complaints of shortness of breath may be related to his obesity and possible coronary artery disease.

**Gomez A. Rafael, M.D., State Agency Physical RFC, April 7, 2005, (Tr. 155-162)**
Exertional Limitations:
Can occasionally lift and/or carry 50 lbs.
Can frequently lift and/or carry 25 lbs.
Can stand and/or walk for a total of about 6 hrs. in an 8-hour workday
Can sit for a total of about 6 hrs. in an 8-hour workday
Push/Pull unlimited

No postural limitations, manipulative limitations, visual limitations, communicative limitations or environmental limitations.

Patient is not fully credible. He gave as a diagnosis COPD however his PFS are normal. Has HTN under good control, has a h/o hiatal hernia with GERD. Physical exam is normal. He gave a h/or of hearing loss since age of 5, however the neuro exam, including cranial nerves is intact. He is reduced to medium work.

**McClung Health and Wellness Center, Charles S. McClung Sr., D.O., October 2000-May 2005(Tr. 163-194, 236-38)**
Dr. McClung treated Claimant for various complaints including sinusitis, stomach aches, low back pain, lightheadedness, breathing difficulty, left shoulder pain, acid reflux, dry skin, and an ingrown toenail. He provided conservative treatment including prescribing medications.

A 7/25/2001 exam of the esophagus revealed esophageal dysmotility, hiatal hernia and gastroesophageal reflux. A 7/9/2003 CT exam of Claimant's chest revealed a calcified granuloma that required no medical follow-up.

**Case Analysis, May 3, 2005, (Tr. 195-95)**
Chest x-ray showed normal sized heart and clear lungs. No objective criteria to confirm CAD–cardiac severity non-severe.

**Katherine Ball, M.S., Psychological Evaluation, June 30, 2006 (Tr. 197-200)**
WAIS-III:
Verbal IQ -               80
Performance IQ -         79
Full Scale IQ -          78

These IQ scores fall in the Borderline Range.

| Verbal Subtests: | Scaled Score | Performance Subtests: | Scaled Score |
|---|---|---|---|
| Vocabulary | 8 | Picture Completion | 5 |
| Similarities | 8 | Digit Symbol/Coding | 8 |
| Arithmetic | 6 | Block Design | 7 |
| Digit Span | 4 | Matrix Reasoning | 6 |
| Information | 7 | Picture Arrangement | 8 |
| Comprehension | 7 | | |

WRAT-3 Standard Scores:
Reading -       86
Spelling -      69
Arithmetic -    82

Reading and arithmetic scores fall in the low average range.  Spelling score fell in the deficient range.

Diagnoses:
Axis I:                 311 Depressive Disorder NOS
Axis II:        Borderline Intellectual Functioning
Axis III:       Diabetes, COPD, high blood pressure, lightheadedness, pain and burning in legs
                and feet

Prognosis for overcoming his depressive symptoms is good.  Prognosis for returning to labor intensive work is poor given his breathing impairment.

**New River Health Association, Progress Notes, April 2001-November2002, (Tr. 201-14)**
July 19, 2001 - hearing and breathing tests requested.  Claimant also complained of lightheadedness and trouble swallowing.  Dr. Doyle diagnosed exertional dyspnea, hearing loss, and gastroesophageal reflux disease.

January 18, 2002 - complains of dizziness and shortness of breath.  S. Mehfa, D.O. diagnosed vertigo and shortness of breath and prescribed Antivert and Albuterol.  Claimant returned a month later and noted his breathing was much improved.  The Antivert helped with the dizziness.  He continued to complain of shortness of breath in May, June, September and November, 2002, but his lungs remained clear without wheezes or crackles.

D.      Testimonial Evidence

        Testimony was taken at hearings held on July 17, 2006.  The following portions of the

testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        Mr. Loudermilk, state your whole name, please.

A        Junior Lincoln Loudermilk.

Q        Okay.  And what's your date of birth?

A        October 29, 1947.

Q        And how old does that make you today?

A        58.

                        *               *               *

Q        And how far did you go in high school?

A        I graduated to the 12th.

                        *               *               *

Q        Now, when's the last time you worked?

A        April of '01.

Q        Okay.  And what did you do?

A        I stacked lumber.

Q        Okay.  Who did you stack lumber for?

A        ITL.

Q        Okay.  Now, before we talk about different types of - - different employers - - is it
- - how long did you do the same type of job?  Not different employers because I understand one
time they were bought out - - how long did you work at that lumber mill?

A        Both of them together?

Q        Yeah.

A     13 years.

Q     Okay.  That's what I'm trying to get at.  And can you explain to me, to me your, your job duties, if you will?

A     Well, I stack, I stack lumber.  Then when we get done stacking, sometimes in the evenings I clean, I clean out from under the chain.

Q     Okay.  Now, when you say you stack lumber, did you stack it by hand or machine or both?

A     Both.

                    *                    *                    *

Q     No, how heavy was that board?

A     Well, we stacked different sizes.

Q     Okay.

A     They ranged from 25 pounds to 75.

                    *                    *                    *

Q     Okay.  Now, is it fair to say that you were on your feet most of the day?

A     Right.

Q     Okay.  Up walking around?

A     Yes.

                    *                    *                    *

Q     Now, you also said you, you did some stuff after you stacked.  What's the kind of stuff that you did?

A     Well, sometimes they have us come in on the weekend or in the evenings to clean

out a tractor trailer load of sawdust.

Q        Okay.  Now, when you say clean out a tractor trailer load of sawdust - -

A        Um-hum.

Q        - - am I fair to assume that that's just not sawdust on the floor?  In other words - - you're just not sweeping - - do they keep the sawdust for some other purpose?  That's what I'm trying to get at.

A        Yeah, they keep it.  That's what they burn to dry the lumber.

*                    *                    *

Q        Okay.  Now, why - - in your own words, why did you have to stop work?

A        The dust was starting to affect my breathing.

Q        Well, can you explain to the judge how the dust was affecting your breathing?

A        It was - - it just felt like my chest was getting tight and like I couldn't - - you know, I couldn't breathe or just - - I can't explain - -

*                    *                    *

Q        Okay.  Now, and you said you quit working in 2000?

A        One.

Q        One.  Now, since that time - - since you stopped working, has your breathing gotten better?

A        No, no, sir.

Q        How can you judge it's not gotten better?  How do you know?

A        Well, I'm still - - you know, I'm still having to sit down and have to go in - - you know, in my air condition and everything.

9

       *     *     *

Q  - - when you, when you go and - - how far can you walk without having to stop and rest, max?

A  About 100 feet.

Q  Okay.  And what, what makes you want to stop or have to stop?

A  Well, my feet and legs go to hurting.  Then, you know, my chest starts, my chest start - -

       *     *     *

Q  Where's that - - I know, you know - - you're doing fine.  Well, when - - how far - - how long can you stand up without having to sit down?

A  10 or 15 minutes.

Q  Okay.  Have any trouble sitting?

A  My feet and legs hurt.

Q  Okay.  Do they - - are they hurting now?

A  Yeah.

       *     *     *

Q  Are you on any medication for diabetes?

A  Yes, sir.

       *     *     *

Q  I'm not talking about the medication.  On your - - when you get - - when your legs start to bother you, what do you do to make them feel better?

A  Oh, I usually sit down.

Q       Okay.

A       Prop my feet up.

Q       Okay.  Now, other than tingling, do they swell?

A       Yeah, they're starting to now, my ankles are.

Q       Okay.  And how long do you have to keep them propped up before the swelling goes down?

                        *                    *                    *

Q       So, how long do you have - - if swelling's a problem, how long do you have to be on them before that's a problem?

A       Five or 10 minutes, sometimes less.

Q       Okay.  The other question I thought was - - so, we talked about your diabetes. Any other problems you have that you think you can - - that diabetes causes?

A       My hearing.

                        *                    *                    *

Q       What problem do you have with your hearing?

A       It's - - I can hear only - - it's starting to - - I'm starting to lose my hearing.

                        *                    *                    *

Q       Do you have any other problems that stop you from working, that you believe?

A       I got that hiatal hernia.

Q       Okay.  How long have you had it?

A       They found it in '02, '01 or '02, I think.

Q       But you had an operation for that, didn't you?

A       No, uh-uh.

Q       You didn't?

A       No, sir.  They said they can't help it.

Q       That's what I'm trying - -

A       Okay.  I take medicine for it.

Q       Okay.  Now, what - - let's talk about - - what do you do on an average day?  What time do you get up?

A       Around 6 or 6:30.

Q       Okay.  And what causes you to get up?

A       I just - - I wake up and my, my feets are hurting.

Q       Okay.  And - -

A       I got to get up.

Q       Why, why do you - - when your feet are hurting, why do you have to get up?  What do you do to make them feel better?

A       Sometimes I usually soak them in water.  I mean, in water.

Q       Okay.

                        *               *               *

Q       Okay.  Now, what do you fix yourself to eat?

A       Cereal sometimes.

                        *               *               *

A       I usually watch the news.  That's about the time the news starts.

Q       Okay.  So you watch the news.  Now, we're at 7:30, what do you do?

A       I usually watch it about 8.

                    *               *               *

Q       Okay.  So, now we're at 8, 8:25 what do you do?

A       Then - - by then my feet's really hurting then.

Q       Okay.

A       Then I usually go into my - - where my, where my air conditioner is.

Q       Okay.

A       And prop my feet up.

                    *               *               *

Q       Okay.  So, so, you go prop your feet up - - how long do you have to keep your feet propped up?

A       Sometimes I'll wait about a half an hour or so.

Q       Okay.  Then now, it's probably 9:30, 10 o'clock - - what do you do?

A       It's - - you know, it's nice and cool in there and I can't sleep good at night. Sometimes I doze off.

Q       Okay.  So, let's say you accidentally doze off, what time do you usually get up?

A       I usually doze off about an hour maybe, sometimes.

Q       So, now it's about 11, 11:30 - -

A       I'm thinking about getting my dinner fixed.

Q       Okay.

A       I usually get - - fix a chicken breast.  I bake it or a potato.

Q       Okay.

A       Then I put it in the oven.  Then I, I just - - I go back to my room because that oven gets hot and it's - - it, it gets to my breathing, that thing.

Q       Okay.  So, while it's cooking, you go, you go - -

A       Prop my feet back up.

                    *                    *                    *

Q       Okay.  So, then what do you do?

A       Then - - by then I usually watch - - maybe I watch the late news around noon while I'm eating or something.

Q       Okay.

A       And then after that, my mail - - the mail usually runs then.

Q       Okay.  I'm going to do something I usually don't do - - I'm going to ask you a question.  I want to put it on the record.  You're sitting there rubbing your knees.  Are you doing that because you're nervous or are you doing that because they hurt?

A       They're hurting.

                    *                    *                    *

Q       So, let's go back to, to, to what we're doing for, for - - you finished lunch.  Now, where is the mailbox?

A       About 50 feet from my house.

                    *                    *                    *

Q       Now, can you walk all the way down there and back without having to stop?

A       Sometimes I, sometimes I stop.  I take it easy.

Q       Okay.  Then what do you do?

A    Now, my dad, my dad lives across the street from me and I usually take his to him.

Q    Okay.  How far a walk is that?

A    About 100 feet.

Q    Okay.  Can you do that without stopping?

A    Sometimes.

                    *              *              *

A     Yeah, I take it over there and I usually watch T.V. with him and - -

                    *              *              *

A    And maybe I'll sit on the porch for a couple hours.

Q    Okay.  What time is it now when you get back home?

A    Probably around three.

                    *              *              *

Q    Okay.  Then what do you do?

A    Then I usually go back in my room where the air condition is because my dad don't have any so, I have to prop my feet back up.

Q    Okay.  So, now it's 3:30 - - how long do you have to stay in the air condition?

A    Probably half an hour, 45 minutes.

Q    Okay.   Then what do you do?

A    Then I'm thinking about getting something to eat sometime.  Either that or go watch the T.V. or see what's on T.V.

Q    Okay.

A      Or watch a movie.

Q      Okay.  Now, so, so what do you do for the rest of the day?

A      Well, after I get done watching a movie I - - that's about - - I fix my supper and then I have to take my blood pressure pill.

                 *                *                *

A      Then I might fix, I might fix a chicken again or just eat a sandwich or - -

Q      Okay.

                 *                *                *

Q      Okay.  Then what do you do?

A      Then I watch the news.  I have a recliner where my T.V. I prop my feet up there watching T.V.

Q      Okay.  And - -

                 *                *                *

A      Then, then in the evenings I watch Wheel of Fortune and - -

Q      Okay.

A      - - Jeopardy and all - -

                 *                *                *

Q      And do the same thing.  Well, let me ask you this way - - I, I know it's sort of unfair of me to ask this way, but what did, what did you used to do that you don't do anymore?

A      I used to mow my yard.

                 *                *                *

Q      Okay.  What, what, what, what, what happens?  For the, for the, for the record - -

what happens when you get the fumes?

A        It just, it just clogs my breathing up and it - - I gasp for air, you know, like I said. Just my chest gets tight.

Q        Okay.  And then what else did you used to do that you can't do?

A        Hunt and fish.

                        *                *                *

Q        Okay.  When you hunt and fish - - when's the last time you went to either hunt or fish?

A        Hunt - - about, about a year, about a year and a half ago.

Q        Okay.  And when's the last time you - - what happened the last time you went to hunt?  I mean - -

A         I just couldn't - - I couldn't walk, you know, too far.  I'd have to sit down.

                        *                *                *

Q        Now, Social Security sent you to see this Dr. Gorshad.  Do you remember seeing him?  That's been over a year ago now, but my question is he gave you a breathing test.  Okay?  Where you blow into this machine and they measure how much you can, how much you can blow.

A        I think.

Q        Yeah.

A        Yes, sir.

Q        Okay.  And, you worked in the coal mines.  You're, you're getting a 10 percent black lung so, you've taken that test previously, right?

A        Yes, sir.

                              *              *              *

Q        All right.  Well, I, I wanted the record to note that you're using what I call a, a hand fan - - F A N.  That's - - which is okay, but I don't see that a lot, but I know what a hand fan is.  At least at my age.  Why - - just, for the record, put on - - tell us why you're using that.

A        It's kind of helping me breathe a little bit better.

                              *              *              *

Q        Is his past work described in terms of exertional and skill levels?

A        Well, Your Honor, the claimant worked from 1988 through April of 2001 as a lumber stacker.  That job is classified as heavy work and it's considered to be unskilled work.  Prior to that he worked from '86 to '88 as a laborer/cleaner in a rock quarry and in my opinion that would also be heavy and unskilled.

### RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        Mr. Loudermilk, the last 15 years, the vocational expert's telling us that you worked as a - - you worked heavy, unskilled work.  You had a lot of lifting to do.

A        Yes, sir.

Q        What's the easiest job you ever had?

A        Cleaning the dust up, I guess.  Sweeping the dust.

Q        That'd be when he cleaned out the trailers, I guess.

                              *              *              *

ATTY        I think I should put something on the record.  I'm going to do this one of two ways.  I think what the court points out under that issue can be very well pointed out and

even if you follow the grids you get to the same conclusion in a different way. I'm not trying to beat a dead horse. I'm just saving my appeal purposes on both of these. I think it qualifies under what the court said and also using the grids because there's no light or medium - - even medium work he's done successfully. So, I would argue - - the only other thing I would argue to bolster that point is, while once again I don't think - - with all due respect - - this may sound a little unkind - - I don't think Mr. Loudermilk is dumb as a rock and once again would not present to - - pursue that. I think to bolster my point I would argue that the education of the 12th grade has been rebutted on to getting to limited, if limited only, because of his past relevant work and, if you look at his grades they're basically - - in high school level they were Ds, if not D minuses and some Cs. So, with that, Your Honor, I don't have anything to add except to, to say I think both under what the court suggested and even under the grids he would qualify for disability.

E.      Lifestyle Evidence

        The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how claimant's alleged impairments affect his daily life:

•       Watches tv (Tr. 107)

•       Reads newspaper (Tr. 107)

•       Visits his father across the road (Tr. 107)

•       Awake "all hours of the night" due to his breathing (Tr. 108)

•       Has trouble taking a shower due to "trouble getting [his] breath (Tr. 108)

•       Does not prepare meals because his spouse does the cooking (Tr. 109)

•       Does not do yard work due to breathing (Tr. 110)

- Goes outside a little each day (Tr. 110)

- Drives occasionally (Tr. 110)

- Shops for food with his wife (Tr. 110)

- No longer enjoys being around other people (Tr. 112)

- Can walk fifty (50) feet before having to stop and rest (Tr. 112)

- Obesity (Tr. 152)

### III.  The Motions for Summary Judgment

A.  <u>Contentions of the Parties</u>

Claimant contends that the ALJ erred by not questioning the vocational expert at the hearing whether jobs existed in the national economy which Claimant could perform.  Claimant argues that he has nonexertional, severe impairments.  Furthermore, Claimant can no longer perform his past relevant work.  Claimant argues that when a claimant cannot perform his past relevant work, a presiding ALJ is required to inquire of a vocational expert (VE).  Here, a VE was present at the hearing, and did, in fact, testify.  However, Claimant argues the ALJ erred because he did not direct the VE to describe or clarify any jobs that he could possibly perform.

Commissioner maintains that substantial evidence supports the ALJ's determination that Claimant retained the RFC to perform a full range of unskilled medium work pursuant to Medical-Vocational Guideline Rule 203.14.  Specifically, Commissioner notes that medication controlled Claimant's hypertension and acid reflux.  Similarly, Commissioner argues that Claimant's breathing problems did not result in any clinically observable irregularities.  Moreover, Commissioner argues that no examining physician ever commented that Claimant appeared short of breath during an examination and two state agency physicians reviewed the medical evidence of record and

concluded that his breathing impairment would not prevent him from performing a full range of medium work. Commissioner also maintains that Claimant's hearing problems would not prevent him from performing a full range of medium work. Commissioner points to the fact that no examining physician has ever noted that Claimant had difficulty hearing, nor did Claimant wear any assistive hearing air or require any special assistance due to his hearing impairment during the administrative hearing. Commissioner further avers that neither Claimant's diagnosis of mild depression, nor his borderline intellectual functioning, would result in limitations that would prevent him from performing the mental demands of unskilled medium work. Finally, Commissioner argues that Claimant has failed to identify any specific functional limitations arising from his impairments that the VE should have considered. Commissioner maintains that the record supports that Claimant's diagnosed conditions did not result in objective functional limitations that would prevent him from performing unskilled medium work and therefore, substantial evidence supports the ALJ's decision that Claimant was not disabled.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.    <u>Judicial Review</u>. Only a final determination of the Commissioner may receive judicial review. <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.    <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th

Cir. 1984).

10.    <u>Social Security - Residual Functional Capacity</u>.  A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence.  <u>Id</u>.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  <u>Id</u>.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  <u>Id</u>.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  <u>Id</u>.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  <u>Id</u>.

11.    <u>Social Security - Vocational Expert</u>. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

12.    <u>Social Security - Vocational Expert - Hypothetical</u>.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  <u>Walker v. Bowen</u>, 889 F.2d 47, 50-51 (4th Cir. 1989).  The ALJ is afforded "great latitude in posing hypothetical questions," <u>Koonce v. Apfel</u>, No.

98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[6], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

13.     Vocational Expert Purpose.  "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).[7]  "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

C.     Discussion

1.     Does the Failure of the Presiding ALJ to Question a Vocational Expert on Existing Jobs in the National Economy Warrant Remand?

"The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy to which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).[8]  "[R]equiring the testimony of a vocational expert is discretionary."  Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

In this instance, the issue is whether jobs exist in significant numbers in the national economy that the Claimant can perform.  The ALJ, in his decision, determined that there are,

---

[6] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

[7] See F.N. 6.

[8] See F.N. 6.

without questioning the VE on the subject.

The Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [claimant] can do, given [claimant's] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). In this case, the ALJ was able to demonstrate this without the help of the VE. The Medical-Vocational Guideline (GRID) Rules "reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevent the performance of his vocationally relevant past work." 20 C.F.R pt. 404, subpt. P, app. 2, § 200.00(a) (2008). It would have been fruitless for the ALJ to question the VE because the VE would have only reiterated what the ALJ already knew. GRID Rule 203.00(a) states that "[t]he functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work. Approximately 2,500 separate sedentary, light, and medium occupations can be identified, each occupation representing numerous jobs in the national economy which do not require skills or previous experience and which can be performed after a short demonstration or within 30 days." 20 C.F.R pt. 404, subpt. P, Appendix 2, § 203.00(a) (2008).

The ALJ appropriately found, based upon substantial evidence, specifically GRID Rule 203.14, that Claimant was not disabled and jobs existed in the national economy that he could perform. According to GRID Rule 203.14, an individual of advanced age, whose RFC limits him to medium work as a result of his severe medically determinable impairments, with a high

school education and previous unskilled work experience is not disabled. 20 C.F.R pt. 404, subpt. P, app. 2, § 203.00 (2008).

It is the duty of the ALJ to resolve conflicts in the evidence; whereas it is the duty of this Court to determine whether the Commissioner's findings are supported by substantial evidence. Hayes, 907 F.2d at 1456. Here, it can be said that substantial evidence supports the ALJ's decision because although he did not question the VE, he was under no duty to do so and Claimant is not disabled under GRID Rule 203.14

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's conclusion that work exists in significant numbers in the national economy that Claimant can perform. The ALJ's failure to question the VE on this matter was not error because the ALJ appropriately relied upon Medical-Vocational Guideline (GRID) Rule 203.14 to reach his conclusion that Claimant is not disabled and could perform a full range of unskilled medium work.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: February 27, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE